**JOHNSON FISTEL, LLP**
Frank J. Johnson (SBN 174882)
FrankJ@johnsonfistel.com
Brett M. Middleton (SBN 199427)
BrettM@johnsonfistel.com
Jonathan M. Scott (SBN 323322)
JonathanS@johnsonfistel.com
501 West Broadway, Suite 800
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-185

*Counsel for Plaintiffs Kathleen Sanetel
and Vijayendra Gururaja*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KATHLEEN SANETEL and VIJAYENDRA GURURAJA , derivatively on behalf of VAXART, INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>STEVEN J. BOYD, TODD C. DAVIS, CEZAR ANDREI FLOROIU, MICHAEL J. FINNEY, WOUTER W. LATOUR, ROBERT A. YEDID, SEAN N. TUCKER, KEITH MAHER, KAREN WILSON, JULIE CHERRINGTON, DAVID WHEADON, MARGARET ECHERD, AND ARMISTICE CAPITAL, LLC,<br><br>Defendants,<br><br>-and-<br><br>VAXART INC., a Delaware corporation,<br><br>Nominal Defendant. | Case No.: 3:22-cv-02868<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br><br>DEMAND FOR JURY TRIAL |

# <u>TABLE OF CONTENTS</u>

I.      NATURE AND SUMMARY OF THE ACTION ..................................................................1

II.     JURISDICTION AND VENUE ............................................................5

III.    THE PARTIES............................................................................6

    A.      Plaintiffs ................................................................................6

    B.      Nominal Defendant..............................................................6

    C.      Individual Defendants ..........................................................7

    D.      Defendant Armistice Capital.................................................9

IV.     SUBSTANTIVE ALLEGATIONS .........................................................9

    A.      Background Of Vaxart And Armistice ...................................10

    B.      Insiders Cashed In On COVID-19
        Using A Classic Pump And Dump Scheme.............................11

    C.      Defendants Grant Armistice The Unimpeded
        Ability To Convert Its Warrants Into Common
        Stock And Immediately Sell In Exchange For Spring-Loaded Options...............14

    D.      The Individual Defendants Cause
        Vaxart To Make Improper Statements During The Relevant Period ...................16

V.      REASONS THE INDIVIDUAL
    DEFENDANTS' STATEMENTS WERE IMPROPER.................................................19

VI.     THE TRUTH EMERGES.........................................................20

VII.    DEFENDANTS' IMPROPER INSIDER SELLING................................................22

VIII.   DUTIES OF THE INDIVIDUAL DEFENDANTS TO VAXART ...............................24

    A.      The Individual Defendants' Fiduciary Duties............................24

    B.      Additional Duties Of The Committee Defendants...............................27

    C.      Duties Pursuant To The Company's Code Of Conduct.........................30

    D.      Duties Pursuant To Corporate Governance Principles .........................32

    E.      Control, Access, and Authority.................................................33

    F.      Reasonable and Prudent Supervision..........................................33

IX.     BREACHES OF DUTIES .........................................................34

X.      CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION ..............37

i

XI.    DAMAGES TO VAXART ................................................................38

XII.   DERIVATIVE AND DEMAND ALLEGATIONS ...........................................39

       A.    Plaintiffs' Demand Allegations.......................................................40

       B.    The Board's Investigation Was Unreasonable
             Under Delaware Law And Its Refusal Of The
             Demand Was Not A Valid Exercise Of Business Judgment ................................41

XIII.  CLAIMS FOR RELIEF ................................................................44

XIV.   PRAYER FOR RELIEF ................................................................50

XV.    DEMAND FOR JURY TRIAL ................................................................52

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiffs Kathleen Sanetel and Vijayendra Gururaja ("Plaintiffs"), by their undersigned counsel, bring this shareholder derivative action on behalf of Nominal Defendant Vaxart, Inc. ("Vaxart" or the "Company") against certain current and former officers and directors of the Company and Armistice Capital, LLC ("Armistice") for violations of law, including breaches of fiduciary duties, waste of corporate assets, aiding and abetting, unjust enrichment, misappropriation of material, non-public information, and for contribution for violations of the federal securities laws. Plaintiffs make these allegations upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon the investigation of counsel, which includes, without limitation: (i) review and analysis of public filings made by Vaxart and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (ii) review and analysis of press releases and other publications disseminated by the Company, certain of the defendants and other related non-parties; (iii) review of news articles, shareholder communications, and postings on Vaxart's website concerning the Company's public statements; (iv) publicly available pleadings, papers, and court documents, including any documents filed with and publicly available from the related pending securities fraud class action, *In re Vaxart, Inc. Securities Litigation*, Case No. 3:20-cv-05949-VC (N.D. Cal.) (the "Securities Class Action"); and (v) review of other publicly available information concerning Vaxart, the Individual Defendants (defined below), and the Wrongful Refusal Defendants (defined below).

## I.     NATURE AND SUMMARY OF THE ACTION

1.     This is a shareholder derivative action brought by Plaintiffs on behalf of Nominal Defendant Vaxart against certain of its officers and directors for breaches of fiduciary duties and other violations of law from March 18, 2020 to the present (the "Relevant Period"). These wrongs resulted in hundreds of millions of dollars in damages to Vaxart's goodwill and business reputation.

2.     Vaxart purports to be a biotechnology company primarily focused on the development of oral recombinant vaccines that target a range of infectious diseases, including COVID-19, norovirus, seasonal influenza, and respiratory syncytial virus, or RSV, a common cause of respiratory tract infections. Vaxart has never brought a drug or vaccine successfully to market.

3.     Now, however, Vaxart's focus is on defending against federal prosecutors, the SEC, and its own shareholders who have sued the Company and certain of its current and former officers and directors for misleading the public about its role in the U.S. government's Operation Warp Speed ("OWS"), a multibillion dollar program designed to accelerate COVID-19 vaccine and treatment research, and attempting to pull off the classic pump-and-dump scheme boosting stock prices on the back of repeated false COVID-19 vaccine proclamations.  The point of the scheme was to rapidly inflate the price of Vaxart stock so the Vaxart Board and its then majority shareholder, Armistice Capital LLC ("Armistice"), could enrich themselves at the expense of the Company and its shareholders.  Armistice is a hedge fund that, until very recently, was Vaxart's largest shareholder. Armistice's founder and one of its managing directors are members of the Vaxart Board.

4.     Vaxart's experimental COVID-19 vaccine candidate was claimed to be unique because it is an oral tablet, as opposed to a vaccine administered by an injection, like many of the others in development.  OWS has granted billions of dollars to more than a half-dozen pharmaceutical companies based on the promise of their vaccine technology.  On June 26, 2020, Vaxart issued a press release claiming it was "one of the few companies selected by Operation Warp Speed, and that ours is the only oral vaccine being evaluated."  This announcement sent the Company's stock price skyrocketing to $17 from less than $3 a share prior to the news release.  The problem, however, was *that Vaxart was not among the pharmaceutical companies selected* by the U.S. government through OWS to receive substantial funds to support their research and production efforts.  Rather, *its involvement with the program was limited*, with its vaccine candidate only selected for sponsorship in their preliminary test studies on animals.

5.     By June 26, 2020, however, the pump-and-dump scheme was already underway.  On July 25, 2020, *The New York Times* published an article entitled "Corporate Insiders Pocket $1 Billion in Rush for Coronavirus Vaccine" that exposed the Executives' and Directors' self-dealing. *The New York Times* explained that the Company's biggest shareholder, Armistice, owned warrants that gave it the right to purchase 21 million shares of Vaxart stock at prices between $0.30 - $1.10 per share. According to the *Times* article, on June 8, 2020, *just prior to the Company's press release* regarding OWS, the Executives and Directors changed the terms of Armistice's warrants in order to make "it

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

easier for the hedge fund to rapidly acquire the 21 million shares, rather than having to buy and sell in smaller batches."  Moreover, less than two weeks before this announcement, on June 15, 2020, *the Company granted stock options to purchase over 1.7 million shares of Vaxart stock* with a strike price of $2.46 to its then Chief Executive Officer ("CEO") Cezar Andrei Floroiu.

6.     According to *The New York Times*, immediately upon the Company's June 6, 2020, announcement that its vaccine candidate was included in OWS, Armistice took quick advantage of the "stock's exponential increase" by exercising its warrants and purchasing Vaxart stock much more quickly than it would have been able to do without the modified terms.  *Armistice made a profit of more than $197 million*.  Defendant Floroiu's stock options "were worth about $4.3 million" when granted but were now "worth more than $28 million. . . . Vaxart's board members also received large grants of stock options, giving them the right to buy shares in the company at prices well below where the stock is now trading."  These well-timed stock option grants and the warrant changes *were an illegal use of inside information termed "spring-loading" and constitute a breach of fiduciary duty*.

7.     Less than a month later, the Securities Class Action was filed, representing the first of several shareholder lawsuits that would be filed in the ensuing months against Vaxart and certain of its officers and directors, and against Armistice.  That would prove just to be the beginning.

8.     On October 14, 2020, Vaxart revealed in a SEC filing that it is being investigated by federal prosecutors and the SEC over the disclosure of its involvement in OWC, stating that the Enforcement Division of the SEC requested that the Company provide, on a voluntary basis, "a variety of documents that broadly pertain to same subject matters of the documents provided to the U.S. Attorney's Office, and related matters," and that the Company "has voluntarily provided documents requested by the SEC and is cooperating with this informal inquiry."  In addition, the SEC filing outlined several similar lawsuits filed in California and one in Delaware since August 2020 alleging violations of federal securities laws by Vaxart and a number of its officers and directors.  The Company was also served with a grand jury subpoena in July 2020 from the U.S. District Court for the Northern District of California relating to the same conduct.

9.     As a result of the misconduct alleged herein, Vaxart has suffered enormous economic and reputational harm including, but not limited to, a significant loss in market capitalization,

compromised financial integrity, and irreparable damage to its credibility in the business community and financial marketplace.  The Company must now defend the Securities Class Action, among other litigation, and the ongoing investigation by federal prosecutors and the SEC, and will incur substantial costs in connection with its continued defense of these actions taken against it and any others that may be taken in the future.

10.    Although the Company has been severely injured, Vaxart's Board members have not. By contrast, ***these individuals have collectively pocketed millions of dollars in fees, salary, incentive-based compensation payments and other benefits*** that were not justified in light of Vaxart's performance while under their stewardship.  These payments wasted valuable corporate assets and unjustly enriched these individuals at the expense of the Company and its shareholders.

11.    On March 5, 2021, Plaintiffs made a written demand (the "Demand") on Vaxart's board of directors (the "Board") to investigate and take the necessary legal action against those responsible for the damages the Company has suffered as set forth in the Demand and in the Securities Fraud Class Action.  In response to the Demand, Plaintiffs' counsel received an email on March 19, 2021 from Vaxart's counsel advising that the Board would "consider and evaluate the Demand," and "provide [] a further update on this process due course."

12.    After receiving no further response, Plaintiffs' counsel sent a follow-up letter (the "Follow-Up Letter") to defense counsel on April 19, 2021, requesting information regarding the actions the Board had taken to address Plaintiffs' concerns stated in the Demand.  On May 3, 2021, Vaxart's counsel sent an email to Plaintiffs' counsel, which acknowledged receipt of the Follow-Up Letter and stated that Vaxart "anticipates making its quarterly securities filings on May 6, [2021], which will include information regarding the Sanetel Stockholder Litigation Demand."  After reviewing the quarterly securities filing, Plaintiffs' counsel responded to Vaxart's counsel with a letter on May 21, 2021, again requesting information regarding its investigation into the conduct alleged in the Demand.

13.    Although correspondence has been exchanged between Plaintiffs' and Vaxart's counsel, to date Plaintiffs still have not received an answer the Demand or even any substantive information regarding the Board's investigation.  More than a year has passed since the Demand was

sent to the Board, but the Board has effectively ignored the Demand.  The Board's purported investigation and its casual and indecisive response to the Demand was wrongful and unreasonable under Delaware law.  The Board has failed to act independently, in good faith, and within the realm of sound business judgment in investigating and denying the Demand.

14.     In response to the Board's unreasonable and wrongful refusal of Plaintiffs' Demand to disinterestedly and independently investigate and remediate harms caused to the Company, Plaintiffs filed this action alleging breach of fiduciary duty, unjust enrichment, waste, insider trading, and contribution for violations of federal securities laws.  Because the Board's response to the Demand was in breach of their fiduciary duties, as detailed further herein, this derivative action should be permitted to proceed for the benefit of the Company and its shareholders.

## II.    **JURISDICTION AND VENUE**

15.     This Court has jurisdiction over the claims asserted herein under 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

16.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 in that in that this action states a federal question.  Plaintiffs have asserted a federal claim for contribution derivatively on behalf of the Company, arising under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78u-4.  Pursuant to federal statutory law, this Court has original federal question jurisdiction over the federal contribution claim.

17.     The Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

18.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

19.     This Court has personal jurisdiction over each defendant because each defendant is either a corporation conducting business and maintaining operations in this District or is an individual who is either present in this District for jurisdictional purposes or has, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and

markets, such that each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

20.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §§ 1391(b), (c), and (d).   Vaxart maintains its headquarters in South San Francisco, California, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District.  In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

21.     Pursuant to Local Rule 3-5(b), Plaintiff requests the clerk assign this action to the San Francisco Division of this district as, under Local Rule 3-2(c), a substantial part of the events or conduct giving rise to the claims herein occurred in San Mateo County, California.

## III.   THE PARTIES

### A.     Plaintiffs

22.     Plaintiff Kathleen Sanetel has been a beneficial holder of Vaxart common stock since at least 2009 and has continuously been a Vaxart shareholder since that time.

23.     Plaintiff Vijayendra Gururaja has been a beneficial holder of Vaxart common stock since at least 2020 and has continuously been a Vaxart shareholder since that time.

### B.     Nominal Defendant

24.     Nominal Defendant Vaxart is a Delaware corporation with its headquarters located at 170 Harbor Way, Suite 300, South San Francisco, California 94080.  Vaxart purports to be a biotechnology company primarily focused on the development of oral recombinant vaccines that target a range of infectious diseases, including COVID-19, norovirus, seasonal influenza, and respiratory syncytial virus, or RSV, a common cause of respiratory tract infections.  Vaxart had 126,445,811 shares of common stock outstanding as of May 6, 2022.

C.   **Individual Defendants**

25.   Defendant Michael J. Finney ("Finney") served as Vaxart's CEO from 2009 until 2011, and as a director since July 2007.  Finney is a member of Vaxart's Audit Committee.  Finney approved the issuance of the spring-loaded options and the Armistice warrant amendments, as described herein.  On June 8, 2020, Finney received spring-loaded options to purchase 65,700 shares of Vaxart stock with a $2.39 strike price.  Finney personally benefited from his receipt of the spring-loaded options.  Finney is a citizen of California.

26.   Defendant Steven J. Boyd ("Boyd") served as a director of the Company from October 25, 2019 until his resignation on January 28, 2021.  Boyd is Armistice's founder, sole owner, Chief Investment Officer ("CIO"), and Managing Partner.  At all relevant times, Boyd has also served as a director of the Armistice Master Fund.  Armistice Capital is the parent entity of multiple Armistice entities all with the Armistice name, including Armistice Capital Master Fund, Ltd, which held the shares of Vaxart at issue here.  Boyd authorized and approved the issuance of the spring-loaded options and the Armistice warrant amendments, which he benefited from as sole owner of Armistice.  Throughout the events in question, Boyd signed all of Armistice's corporate filings on Armistice's behalf.  Boyd is a citizen of Washington.

27.   Defendant Todd C. Davis ("Davis") has served as a director of the Company since 2019 and as Chairman of Vaxart's Board since July 2, 2021.  Davis is also a member of the Nominating and Governance Committee.  Davis authorized and approved Vaxart's manipulated stock options and the amendment to the warrant agreements with Armistice.  On June 8, 2020, Davis received spring-loaded options to purchase 65,700 shares of Vaxart stock with a $2.39 strike price.  Davis personally benefited from his receipt of the spring-loaded options.  Davis is a citizen of California.

28.   Defendant Cezar Andrei Floroiu ("Floroiu") has served as Vaxart's CEO since June 14, 2020, after having first been appointed as a member of Vaxart's Board on April 13, 2020.  Prior to being appointed to these positions, Floroiu had been employed by Armistice as a senior analyst from January to August 2013.  Floroiu had also previously worked with Boyd at McKinsey & Company ("McKinsey").  Floroiu approved the issuance of the spring-loaded options and the

1    Armistice warrant amendments.  On June 8, 2020, Floroiu received spring-loaded options to purchase

2    54,720 shares of Vaxart stock with a $1.71 strike price, $0.68 below the closing price that day.  On

3    June 15, 2020, Floroiu received additional spring-loaded options to purchase 1,745,280 shares of

4    Vaxart stock with a $2.46 strike price.  Floroiu personally benefited from his receipt of the spring-

5    loaded options.  Floroiu is a citizen of New York.

6         29.    Defendant Wouter W. Latour ("Latour") became Vaxart's President and CEO and a

7    member of its Board in February 2018.  He was thereafter appointed Chairman of Vaxart's Board in

8    December 2019.  Latour was replaced as Vaxart's CEO by Floroiu on June 14, 2020, but Latour

9    continued to serve as Chairman of Vaxart's Board until July 2021.  Latour approved the issuance of

10   the spring-loaded options and the Armistice warrant amendments.  On June 8, 2020, Latour received

11   spring-loaded options to purchase 900,000 shares of Vaxart stock with a $1.70 strike price, $0.69

12   below the closing price that day.  Latour personally benefited from his receipt of the spring-loaded

13   options.  Latour is a citizen of California.

14        30.    Defendant Robert A. Yedid ("Yedid") has served as a Vaxart director since

15   October 25, 2019.  Yedid is a member of Vaxart's Audit Committee and Chairman of the Company's

16   Nominating and Governance Committee.  Yedid approved the issuance of the spring-loaded options

17   and the Armistice warrant amendments. On June 8, 2020, Yedid received spring-loaded options to

18   purchase 65,700 shares of Vaxart stock with a $2.39 strike price.  Yedid personally benefited from

19   his receipt of the spring-loaded options.  Yedid is a citizen of New York.

20        31.    Defendant Keith Maher ("Maher") has served as a director of Vaxart from

21   October 25, 2019 until his resignation on January 28, 2021, and at all relevant times was a member

22   of Vaxart's Compensation Committee.  Since 2019, he has served as Armistice's Managing Director.

23   Maher authorized and approved the issuance of the spring-loaded options and the Armistice warrant

24   amendments.  Maher is a citizen of New York.

25        32.    Defendant Sean Tucker ("Tucker") is Vaxart's founder and Chief Scientific Officer.

26   Tucker has served as Chief Scientific Officer since February 2010.  On June 8, 2020, Tucker received

27   360,000 Vaxart stock options with $1.70 strike price, $0.69 below the closing price that day.  Tucker

28   personally benefited from his receipt of the spring-loaded options.  Tucker is a citizen of California.

33.     Defendant Karen J. Wilson ("Wilson") has served as a Vaxart director since August 25, 2020.  Wilson is the Chairperson of the Audit Committee.  Wilson is a citizen of West Virginia.

34.     Defendant Julie M. Cherrington ("Cherrington") has served as a Vaxart director since August 20, 2021.   Cherrington is a member of the Audit Committee and the Compensation Committee.  Cherrington is a citizen of California.

35.     Defendant David Wheadon ("Wheadon") has served as a Vaxart director since April 21, 2021.  Wheadon is the Chairperson of the Compensation Committee.  Wheadon is a citizen of Washington, DC.

36.     Defendant Margaret A. Echerd ("Echerd") has served as Vaxart's Vice President and Controller since April 2018.  Echerd also served as Vaxart's Principal Accounting Officer from April 2018 until January 2019.  Echerd is a citizen of California.

37.     The Defendants named in ¶¶ 25-36 are referred to herein as the "Individual Defendants."

38.     The Defendants named in ¶¶ 25-27, 29-31, 33-35 are referred to herein as the "Director Defendants."

39.     The Defendants named in ¶¶ 25-32 are referred to herein as the "Securities Class Action Defendants."

40.     The Defendants named in ¶¶ 26-27, 30-32, 36 are referred to herein as the "Insider Selling Defendants."

41.     The Defendants named in ¶¶ 25, 27-29, 30, 33-35 are referred to herein as the "Wrongful Refusal Defendants."

**D.     Defendant Armistice Capital**

42.     Defendant Armistice is a hedge fund incorporated in Delaware and based in New York that focuses on consumer health companies.  Armistice first invested in Vaxart in 2018 and later became controlling shareholder in 2019.  Armistice is a self-described "long/short, value-oriented and event-driven hedge fund" that primarily targets "health care and consumer" companies.

**IV.   SUBSTANTIVE ALLEGATIONS**

43.     Unbeknownst to investors, the Defendants were well aware that Vaxart had shuttered

9

its norovirus program, that it was unable to develop a COVID vaccine, and that the Company had not been selected for OWS participation.  First, during the Relevant Period, Vaxart had only about 15 employees.  Given its small size, it is very likely the Individual Defendants were aware of these issues. Second, the significant insider stock sales by Armistice and certain Individual Defendants during a time when Vaxart's stock was trading at its highest artificially-inflated prices, creates a strong inference of knowledge.  And worse, and in breach of their fiduciary duties and in violation of federal securities law, the Individual Defendants caused the Company to mislead investors and the public about its development and non-selection by OWS for its COVID vaccine and the Company's financial forecasts.  Eventually, the truth came to light, causing the Company's stock to tumble, a securities class action, and other damages.

### A. Background Of Vaxart And Armistice

44.     Vaxart is a small California biotechnology company founded in 2004.  The Company is primarily focused on the development of oral recombinant vaccines that target a range of infectious diseases, including COVID-19, norovirus, seasonal influenza, and respiratory syncytial virus, or RSV, a common cause of respiratory tract infections.  Vaxart has never brought a drug or vaccine successfully to market.

45.     In February 2018, Vaxart became a public company through a reverse merger when it completed its combination with Aviragen Therapeutics, Inc. ("Aviragen"), a publicly-traded company on the NASDAQ.  The newly-combined company then adopted the name "Vaxart" and switched its ticker symbol to "VXRT."

46.     On April 11, 2019, pursuant to a public offering of both common stock and warrants, Vaxart sold Armistice warrants to purchase 4,090,909 shares of Vaxart common stock at $1.10 per share.   Until very recently, Armistice was Vaxart's largest shareholder.   As set forth above, Armistice's founder and one of its managing directors are members of the Vaxart Board.

47.     On September 30, 2019, pursuant to another mixed public offering of common stock and warrants, Defendant Armistice obtained warrants to purchase 16,666,667 shares of Vaxart common stock at $0.30 per share.  Vaxart imposed a beneficial ownership limitation (9.99%) and a 60-day notice requirement on Armistice's ability to convert its warrants to common stock and sell.

1  In addition to holding an outsized number of warrants, by September 30, 2019, Armistice had also

2  acquired a majority stake in Vaxart through its holdings in the Company's common stock.

3      48.    As Vaxart reported in its 3Q 2019 Form 10-Q, as of September 30, 2019, Armistice

4  held approximately 52% of Vaxart's outstanding shares of common stock and "[a]s a result, Armistice

5  has the ability to substantially influence us and exert significant control through this ownership

6  position."   On October 8, 2019, Armistice filed an amended Schedule 13D form noting that it

7  controlled 25 million shares of Vaxart common stock, representing 65.2% of all outstanding shares,

8  which was signed by Boyd.

9      49.    Almost immediately after gaining such control over Vaxart, in October 2019,

10  Armistice expanded Vaxart's Board to eight seats and appointed Boyd, Armistice's Founder and

11  Managing Member, and Maher, Armistice's Managing Director, to Vaxart's Board.

12

13  **B.    Insiders Cashed In On COVID-19**
              **Using A Classic Pump And Dump Scheme**

14      50.    At the end of 2019, Vaxart was a company with 14 employees.  With the COVID-19

15  pandemic ahead, and the rush of the government to provide funding for and contracts to companies

16  with promising vaccines and cures, the Individual Defendants saw an opportunity to cash in on

17  COVID-19 by taking advantage of the scientific naivety of investors and politicians.

18      51.    Before the market opened on March 18, 2020, Vaxart issued a press release, titled,

19  "Vaxart Announces It Entered Into An Agreement With Emergent BioSolutions For The

20  Development And Manufacturing Of Oral Coronavirus (COVID-19) Vaccine Candidate."  The press

21  release further declared that Vaxart had entered into an agreement with Emergent BioSolutions Inc.

22  ("Emergent") to "develop and manufacture Vaxart's experimental oral vaccine candidate for

23  coronavirus disease," adding that it expected "to initiate a Phase 1 clinical study early in the second

24  half of 2020."  Vaxart touted the potential benefits of its orally-administered, room temperature-stable

25  tablet vaccine, which is "based on its proprietary oral vaccine platform."  On this news, Vaxart's

26  shares skyrocketed, closing at $2.34—a 21% gain against the prior day's closing price.

27      52.    After announcing on March 31, 2020 that "it had produced five COVID-19 vaccine

28  candidates for testing in its preclinical models" and "currently expects to initiate" a Phase 1 clinical

1   study of a COVID-19 vaccine "early in the second half of 2020," which produced a modest 4% spike

2   in the Company's stock price, on April 14, 2020, Vaxart announced that the Board had named

3   Defendant Floroiu as the Company's newest director.  Omitted from the announcement, however,

4   were Floroiu's extensive connections to Armistice and its two principals, Boyd and Maher.  The

5   Floroiu announcement drove Vaxart's share price up to a closing price of $2.04—a 16.5% gain against

6   the prior day's closing price.

7       53.    Before the market opened on April 21, 2020, Vaxart declared that the Company

8   "obtained positive pre-clinical results for its COVID-19 vaccine candidates, with several of the

9   vaccine candidates generating immune responses in all tested animals after a single dose."  Though

10  extremely light on details – including animal type and number of test subjects – the press release

11  proclaimed the genius of Vaxart's proprietary platform and the advantages a room temperature-

12  stored, orally- administered COVID-19 vaccine would provide.

13      54.    Vaxart's stock price continued to climb following additional announcements on April

14  28 and 30, 2020, the former announcing 1Q 2020 results and a reiteration of the Company's "focus[]

15  on developing a vaccine candidate for COVID-19," and the latter revealing additional positive pre-

16  clinical animal results, yet again failing to reveal anything of substance to the investing public and

17  merely reiterating the benefits of the Company's proprietary platform.  On each day, the Company

18  experienced substantial intra-day share price spikes: April 28, 2020 saw Vaxart's common stock reach

19  a high of $3.85, before retreating to close at $3.27; April 30, 2020 saw Vaxart hit a high of $3.34,

20  followed by another retreat, this time to $2.70.

21      55.    When Vaxart hit a high $2.00 range, up nearly a shocking 750% since the start of

22  2020, Armistice began to sell.  On April 28, 2020, in conjunction with the intra-day stock spike

23  following the announcement of the Company's 1Q 2020 results and updated business strategy,

24  Armistice sold almost 1.3 million shares, sending the stock price down.  The following day, it sold

25  approximately 875,000 shares, again depressing prices.  One day later, in conjunction with yet another

26  announcement – the April 30, 2020 positive pre-clinical animal results – Armistice dumped an

27  astounding 4.4 million shares, again sending Vaxart's common stock on yet another retreat.

28      56.    This would become a familiar theme over the course of May 2020, as Vaxart's

controlling entity and directors sought to enrich themselves from the COVID-related announcements. In an effort to maintain its share price long enough to allow Armistice to sell out of the Company, positive news continued to pour out of Vaxart and, like clockwork, Armistice simultaneously dumped millions of shares.

57.     On May 12, 2020, the Company announced updated results, including reiterating its prior animal results, and noting that "[t]he manufacturing collaboration with Emergent BioSolutions is progressing well and, provided Vaxart elects to proceed, Emergent is on schedule to produce bulk cGMP vaccine in time for initiation of a Phase 1 clinical study during the second half of 2020." Vaxart's common stock price surged in response, hitting an intra-day high of $3.18, an 11.5% gain against the prior day's close, only to then retreat following a massive contemporaneous sale of approximately 1.6 million shares by Armistice, to close up only 2.8%.

58.     Before the market opened on May 20, 2020, Vaxart again released highly significant news, announcing (i) that it had "selected its lead COVID-19 vaccine candidate" and (ii) noting that it had inked a contract with another manufacturer, Kindred Biosciences, "to manufacture bulk vaccine under cGMP to complement the manufacturing capacity of partner Emergent BioSolutions."   In response, Vaxart's common stock surged, reaching an intra-day high of $3.47, a 13% gain against the prior day's closing price, before yet again retreating under the weight of Armistice's sale of 1.15 million shares to close at $3.19, a modest 4% gain.  Ultimately, from April 28 through the first three days of June 2020, Armistice sold approximately 18,200,000 shares of Vaxart, reducing its common stock holdings down to 7,000,000 shares, and earning gross sales of $53 million, a staggering amount of money, considering Vaxart had a market capitalization of under $8 million when Armistice bought its first warrants approximately one year earlier.

59.     The Individual Defendants' unlawful scheme to dramatically increase Vaxart's share price, grant spring-loaded options, and allow Armistice unrestricted sales: (i) began in April 2020, with the motion to shareholders (in the April 24, 2020 Proxy Statement) to increase the amount of shares Vaxart could issue; (ii) built up steam in June with approval and the grant of options to allow the issuance of millions of shares; (iii) the near-complete removal of the restrictions on Armistice's ability to exercise its warrants and sell the stock, restrictions needed to protect the Company from

insider trading—and; (iv) culminated with material misstatements they knew would raise the value of the struggling Vaxart, allowing for Armistice to cash out.  The scheme succeeded with a $267 million windfall for Armistice.

60.     After months of pumping up Vaxart's common stock and an almost five-week period in which Armistice dumped two-thirds of its common stock holdings on sales exceeding $53 million, representing over 25% of Vaxart's market capitalization of $203 million that day, on June 3, 2020, Armistice abruptly halted its sales entirely.  As of that day, Armistice retained, in addition to its 7,000,000 shares of common stock, the entirety of both sets of warrants, 16,666,667 warrants to purchase Vaxart common stock at $0.30 per share and 4,090,909 warrants to purchase the stock at $1.10 per share.

### C.   Defendants Grant Armistice The Unimpeded Ability To Convert Its Warrants Into Common Stock And Immediately Sell In Exchange For Spring-Loaded Options

61.     On June 3, 2020, *Bloomberg* and the *New York Times* identified five companies selected for funding by OWS.  Vaxart was not among those listed, a fact the Defendants knew on June 3, 2020 but failed to disclose publicly.  At the time, Vaxart did not qualify for the OWS's strict set of selection criteria.  And, the Defendants would have known from the extensive amount of information required by the OWS that Vaxart would not qualify for OWS selection.

62.     The encumbrances previously placed on Armistice's ability to sell – the 60-day notice period and the beneficial ownership limitations – remained in place at this time as well.  However, as set forth below, the scheme to change those limitations and increase available shares was, at that time, in the hands of the Vaxart's Board, controlled by Armistice and their outsized amount of common stock.  Even though OWS had not selected Vaxart's COVID-19 vaccine candidate, the Defendants took full advantage of the public uncertainty around the vaccine candidates, leveraging the global need for a viable COVID-19 vaccine and the market's desire to figure out the remaining identities of the OWS participants into a massive windfall.

63.     The Defendants struck a corrupt bargain by agreeing to trade Armistice the unimpeded ability to convert its warrants into common stock and immediately sell, in exchange for seven officers and directors being granted "spring-loaded options," which they knew would almost immediately be

worth a significant sum in the weeks to come.  Between June 1 and June 5, 2020, Vaxart's Board, including Boyd and Maher, met and approved amendments to the warrant agreements by unanimous written consent.  Gone entirely was the 60-day notice period and both beneficial ownership limitations were hiked up to 19.99%.  The result was that Armistice would be unencumbered in converting its warrants to common stock and immediately selling.

64.     On June 8, 2020, when these amendments became effective, the Board also approved the increase in Vaxart shares from 1.6 to 8 million and granted to Yedid, Davis, Latour, Floroiu, Finney, and others, a total of 3,572,100 options to purchase Vaxart common stock at prices ranging from $1.70 to $2.46.  On June 14, 2020, Latour was replaced by Board member and former Armistice employee, Floroiu, as CEO of Vaxart, who was himself a "personal friend" of Armistice Founder, Managing Member and current Board colleague, Boyd, who also served as his boss when Floroiu worked for the hedge fund.  That same day, Floroiu was granted options to purchase an additional 900,000 shares of the Company's common stock.

65.     Armistice's golden opportunity for profit came three weeks later at the end of June when the scheme provided the windfall.  Before the market opened on June 24, 2020, Vaxart announced that effective Monday, June 29, 2020, it would join the Russell 3000, a stock market index benchmarked to the 3,000 largest publicly-traded U.S. companies.  That day, Vaxart closed at $3.19, a 20% jump against the prior day's closing price.

66.     On June 25, 2020, Vaxart's common stock almost doubled after the Company declared that it had signed a memorandum of understanding with the manufacturer Attwill "to manufacture a billion or more doses per year . . . of our COVID-19 vaccine for the US, Europe and other countries in need."  Vaxart common stock closed at $6.26 that day, a 96% gain against the prior day's closing price.  Vaxart failed to disclose that the contract manufacturer lacked the critically necessary FDA certifications to manufacturer any doses of Vaxart's COVID-19 vaccine and, almost as important, lacked the personnel and operational capabilities to manufacturer a billion or more doses as well.  In short, at the time Vaxart and Attwill inked their agreement, Attwill lacked the ability from a regulatory, personnel, and operational standpoint to manufacturer Vaxart's COVID-19 vaccine, a fact Vaxart either knew or recklessly disregarded.

67.     On June 26, 2020 Vaxart issued a press release titled: "Vaxart's COVID-19 Vaccine Selected for the U.S. Government's Operation Warp Speed."  In no uncertain terms, Vaxart's CEO stated: "We are very pleased to be one of the few companies selected by Operation Warp Speed, and that ours is the only oral vaccine being evaluated."

68.     As expected, this news immediately elevated the price of Vaxart's common stock, hitting an intra-day all-time high on June 26, 2020 of $14.30 before closing at $8.04.  This was a 28% gain from the prior day's closing price.  Not coincidentally, that same day, Armistice sold over 18 million shares of its Vaxart stock.  More than 16 million of these shares were sourced from the conversion of the entirety of Armistice's $.30 warrants to common stock, cashing in just shy of $190 million and causing an almost immediate demotion of the stock price from its intra-day high.

69.     Then, before the stock price could drop any further, on June 29, 2020, Armistice sold an additional 9.4 million.  This grossed the company nearly $78 million more.  In the end, Armistice liquidated all but 0.2% of Vaxart's outstanding common stock, bringing in approximately $320 million.

**D.     The Individual Defendants Cause Vaxart To Make Improper Statements During The Relevant Period**

70.     The Individual Defendants *knew* Vaxart had not been selected by OWS to develop a COVID-19 vaccine and was still the same old company that had never brought a drug or vaccine successfully to market.  Nevertheless, throughout the Relevant Period, the Individual Defendants concealed these failures and misleadingly represented to investors–through SEC filings, press releases, and teleconferences – that the exact opposite was true.

71.     On January 2, 2020, Vaxart issued a press release revealing that its Board had terminated about half of the Company's employees, mostly in the manufacturing division, and that moving forward, Vaxart would "prioritize and focus" its resources on its "norovirus and universal influenza programs":

> On December 26, 2019, the Board of Directors of Vaxart, Inc. approved a reduction-in-force affecting approximately 50% of our employees, which primarily impacted our manufacturing personnel. We expect to incur approximately $375,000 in severance and termination costs and to complete the reduction-in-force by January 31, 2020.

> We plan to prioritize and focus our resources on partnering opportunities, including our norovirus and universal influenza programs, and not on manufacturing capabilities.

72. In a January 22, 2020, press release announcing publication in the Lancet of positive results from a 2016-2017 clinical study of its influenza vaccine, the Individual Defendants had Vaxart disclose that "Vaxart's development programs include oral tablet vaccines that are designed to protect against norovirus, seasonal influenza and respiratory syncytial virus (RSV), as well as a therapeutic vaccine for human papillomavirus (HPV)." The Individual Defendants also had Vaxart claim in this release that "[t]hese results also confirm the value of our oral vaccine platform, particularly for mucosal pathogens such as flu, norovirus, RSV, as well as coronaviruses such as SARS, MERS and the virus that recently emerged in China."

73. In Vaxart's January 31, 2020, press release entitled "Vaxart Announces Initiation of Coronavirus Vaccine Program," the Individual Defendants had the Company announce the commencement of its supposed COVID-19 vaccine program, with its then CEO Latour stating: "We believe our oral tablet vaccines provide substantial potential advantages, especially when targeting mucosal pathogens such as flu, norovirus, RSV and the recently emerged coronavirus."

74. In Vaxart's March 19, 2020 press release announcing its agreement with Emergent Biosolutions for the development and manufacturing of its oral COVID-19 vaccine candidate, its fourth quarter and full year 2019 results, and its commitment to initiating a Phase 1 clinical study of its COVID- 19 vaccine "early in the second half of 2020," the Individual Defendants had the Company state that its norovirus program would be put "on hold" in light of its new focus on its claimed COVID-19 vaccine:

> "This outbreak is a call to duty for all of us here at Vaxart and we are highly focused on the development of the COVID-19 vaccine," Dr. Latour continued. "Accordingly, we have put several vaccine programs on hold, including the norovirus vaccine program for which we recently successfully completed a Phase 1 study and for which we are actively seeking a development partner, as well as our therapeutic HPV vaccine program. The Janssen-partnered Universal Flu program is fully active and on track to be completed in the coming weeks."

75. In Vaxart's April 28, 2020 press release announcing its first quarter 2020 results and updated business strategy, the Individual Defendants had the Company reverse course and claim that its norovirus program was, in fact, ongoing:

> The Company continues to pursue strategic, financial and public-private partnerships to advance its development candidates, including its coronavirus vaccine candidates, norovirus and seasonal influenza vaccine programs.

76.     In Vaxart's May 12, 2020 press release, the Individual Defendants had the Company perpetuate the narrative from the April 28, 2020 press release that its norovirus program was ongoing and at the same time cited a "decrease" in research and development expenses, "mainly due to a reduction in personnel costs after we ceased internal manufacturing as part of our December 2019 restructuring and a reduction in expenditure on our norovirus vaccine candidate."

77.     On June 25, 2020, the Individual Defendants had the Company announce it had signed a memorandum of understanding with Attwill "to manufacture a billion or more doses per year" of Vaxart's COVID-19 vaccine.  Indeed, the title of the press release stated, "Vaxart, Inc. Signs Memorandum of Understanding with Attwill Medical Solutions Sterilflow, LP, Enabling Production of A Billion or More COVID-19 Vaccine Doses Per Year Through Large Scale Lyophilization, Tableting and Coating," and in relevant part states:

> "We believe [Attwill] experience coupled with its ability to manufacture a billion or more doses per year would be a beneficial addition to our group of CDMO [contract development and manufacturing] partners and enable the large scale manufacturing and ultimate supply of our COVID-19 vaccine for the US, Europe and other countries in need," said Andrei Floroiu, CEO of Vaxart Inc. "We believe our oral vaccines, generated on our proven platform, have the potential to offer superior protection against airborne viruses such as SARS-CoV-2 by triggering both mucosal and systemic immunity while being administered by a room temperature-stable tablet, an enormous logistical advantage in large vaccination campaigns."

78.     On June 26, 2020, the Individual Defendants had Vaxart issue a press release titled "Vaxart's COVID-19 Vaccine Selected for the U.S. Government's Operation Warp Speed," with a sub-head stating "OWS to Test First Oral COVID-19 Vaccine in Non-Human Primates."  The press release then stated that Vaxart's "oral COVID-19 vaccine has been selected to participate in a non-human primate (NHP) challenge study, organized and funded by Operation Warp Speed" before adding the following from Vaxart's then newly-appointed CEO, Floroiu:

> "We are very pleased to be one of the few companies selected by Operation Warp Speed, and that ours is the only oral vaccine being evaluated. SARS-CoV-2, the coronavirus that causes COVID-19, is primarily transmitted by viral particles that enter through the mucosa – nose, mouth or eyes – strongly suggesting that mucosal immunity could serve as the first line of defense," said Andrei Floroiu, Chief Executive Officer of Vaxart Inc. "In addition, our vaccine is a room temperature-stable tablet, an enormous logistical advantage in large vaccination campaigns."

## V.   REASONS THE INDIVIDUAL
##       DEFENDANTS' STATEMENTS WERE IMPROPER

79.   At the time they were made, the foregoing statements were materially false and misleading for several reasons.  First, ***Vaxart was not one of the two or three unidentified vaccine candidates selected for funding by OWS*** as OWS imposed strict selection criteria at that time. Indeed, according to the August 26, 2020 NEJM article by OWS' Slaoui and Hepburn, OWS sought vaccine candidates with "the potential . . . to enter large phase 3 field efficacy trials this summer or fall (July to November 2020)."   At the time, according to multiple Vaxart announcements, the Company's COVID-19 vaccine candidate was merely "on track to start a first phase 1 study in the second half of this year, possibly as early as the summer."   Moreover, according to the September 2, 2020, *USA Today* article by HHS' Azar and OWS' Slaoui, OWS targeted "four vaccine-platform technologies" and aimed to select "two from each platform."   Since Vaxart's COVID-19 candidate utilized a "replication defective" platform, the same platform utilized by two of the publicly-named companies, Johnson & Johnson and AstraZeneca***, it could not have been one of the companies under consideration at the time.***

80.   Second, on July 25, 2020, the *New York Times* reported "Vaxart is not among the companies selected to receive significant financial support from Warp Speed to produce hundreds of millions of vaccine doses."   The article quoted a top HHS official as stating "The U.S. Department of Health and Human Services has entered into funding agreements with certain vaccine manufacturers, and we are negotiating with others.  Neither is the case with Vaxart."  On August 19, 2020, Business Insider quoted OWS' Slaoui in an article about companies, including Vaxart, misleadingly touting their connections to OWS as stating, "There's been a number of cases where companies have, frankly, made press releases that have frustrated the hell out of me because they misled, I think, their shareholders and their share price went up the roof just by saying the words Operation Warp Speed in the title of the press release."

81.   Finally, the Company conflated OWS selection and funding with a related program to test Vaxart's COVID-19 vaccine candidate.  As the *New York Times* reported in its July 25, 2020, story "Vaxart's vaccine candidate was included in a trial on primates that a federal agency was

organizing in conjunction with Operation Warp Speed."  That same article also quoted HHS' spokesperson: "Vaxart's vaccine candidate was selected to participate in preliminary U.S. government studies to determine potential areas for possible Operation Warp Speed partnership and support. At this time, those studies are ongoing, and no determinations have been made."

82.    The true facts, which were known or recklessly disregarded by the Individual Defendants during the Relevant Period but concealed from the investing public, were as follows:

       a.    Vaxart was unable to produce a COVID vaccine;

       b.    the Company had not been selected by the federal government to participate in OWS;

       c.    the Company had shuttered its norovirus program in late 2019; and

       d.    as a result of the foregoing, the Vaxart's public statements were materially false and misleading at all relevant times.

83.    The foregoing improper statements were material to a reasonable investor because the misstatements and omission forecasts would alter the total mix of information available.  Vaxart's core business is the development and sale of pharmaceuticals and thus, if the Company had been selected to participate in OWS its profit potential would dramatically increase.  However, Vaxart's misstatements and omissions ultimately hid the fact that the Company could not produce a COVID vaccine and was not selected for OWS.

## VI.    THE TRUTH EMERGES

84.    As a result of the Individual Defendants' false and misleading statements and omissions, Vaxart shares traded at artificially-inflated prices during the Relevant Period.  Once the true facts regarding the Company's financial prospects and future business prospects began to emerge, the Company's stock price fell dramatically, erasing hundreds of millions of dollars market capitalization.

85.    On July 25, 2020, the *New York Times* published an article concerning Vaxart headlined "Corporate Insiders Pocket $1 Billion in Rush for Coronavirus Vaccine," which highlighted the sums Armistice earned from its contemporaneous stock sales and pierced the deliberately misleading obfuscation created by Vaxart's June 26, 2020 press release conflating OWS selection

and funding with non-human primate participation. The article stated:

> Vaxart's vaccine candidate was included in a trial on primates that a federal agency was organizing in conjunction with Operation Warp Speed. But Vaxart is not among the companies selected to receive significant financial support from Warp Speed to produce hundreds of millions of vaccine doses.
>
> "The U.S. Department of Health and Human Services has entered into funding agreements with certain vaccine manufacturers, and we are negotiating with others. Neither is the case with Vaxart," said Michael R. Caputo, the department's assistant secretary for public affairs. "Vaxart's vaccine candidate was selected to participate in preliminary U.S. government studies to determine potential areas for possible Operation Warp Speed partnership and support. At this time, those studies are ongoing, and no determinations have been made."

86.     In other words, as the article explained, Vaxart's NHP participation was merely a trial "organiz[ed] in conjunction with Operation Warp Speed," and not the same as selection for and participation in OWS. The article even went so far as to explain to the public that after HHS reviewed Vaxart's claims about its participation in OWS and contemporaneous stock sales, that HHS "relayed those concerns to the Securities and Exchange Commission," stating in full:

> Some officials at the Department of Health and Human Services have grown concerned about whether companies including Vaxart are trying to inflate their stock prices by exaggerating their roles in Warp Speed, a senior Trump administration official said. The department has relayed those concerns to the Securities and Exchange Commission, said the official, who spoke on the condition of anonymity.

87.     Shortly after the *Times* published its July 25, 2020, article, HHS' Office of Public Affairs' Twitter handle, @SpoxHHS, tweeted out the *New York Times* article and included key language from the article, emphasizing that Vaxart had neither earned nor was in negotiations with OWS for selection and funding, and instead had only been selected for a "preliminary" study "to determine potential areas for possible Operation Warp Speed partnership and support."

88.     With the truth starting to come out, that Monday, July 27, 2020, Vaxart's common stock dropped 9% against the prior trading day's closing price. Over the next three or so weeks through August 19, 2020, Vaxart's stock continued to drop more than 17%.

89.     On August 19, 2020, after the market closed, *Business Insider* published an article confirming that Vaxart had "misled" shareholders by misrepresenting its ties to and involvement with OWS as a means to artificially inflate its stock price. The article quoted the head of OWS saying:

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

> There's been a number of cases where companies have, frankly, made press releases that have frustrated the hell out of me because they misled, I think, their shareholders and their share price went up the roof just by saying the words Operation Warp Speed in the title of the press release.

90.     In response, Vaxart's common stock price fell an additional 4.3% the following day.

91.     Since then, Vaxart has reported that in July 2020, the U.S. Attorney's Office for the Northern District of California served a grand jury subpoena on the Company seeking "information pertaining to the Company's participation in, and disclosure of, an Operation Warp Speed-funded ("OWS") non-human primate study of the Company's oral COVID-19 vaccine and certain corporate, financing and stock transactions."  Vaxart was then informed in October 2020 that "the investigation was being transferred to the Office of the U.S. Attorney for the Eastern District of New York and the Fraud Section of Main Justice" of the Department of Justice.  And in November 2020, Vaxart received another grand jury subpoena from the Department of Justice.

92.     On January 29, 2021, the Armistice directors, who also bear responsibility for the wrongdoing as alleged herein, resigned.

## VII.   DEFENDANTS' IMPROPER INSIDER SELLING

93.     Not all of Vaxart's shareholders were harmed by the Individual Defendants' misconduct.  During the Relevant Period, while in possession of material, adverse, non-public information, Armistice and certain of the Individual Defendants unloaded their holdings of Vaxart stock at bloated prices.  Defendants rushed to conduct their sales while Vaxart's stock was trading at or near its peak stock price.  The timing of the sales took place shortly after news about Vaxart being selected to OWS would break and were designed to capitalize on the jump in stock value as result of this news.  For example, after gaining the ability to exercise its warrants, on June 26, 2020, Armistice sold 18,226,667 shares of the Company's common stock – one day after Vaxart announced that it had contracted with Attwill "to manufacture a billion or more doses per year."

94.     Specifically, the Insider Selling Defendants took advantage of the artificially-inflated prices to sell their Vaxart shares for *over $300 million in proceeds*:

**Davis**

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 4/28/2020 | 60,000 | $3.2750 | $196,500 |
| | | **Total** | **$196,500** |

**Yedid**

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 6/11/2021 | 8,240 | $8.6109 | $86,109 |
| | | **Total** | **$86,109** |

**Echerd**

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 6/9/2021 | 47,555 | $8.00 | $380,440 |
| 6/11/2021 | 1,802 | $8.00 | $14,416 |
| 7/19/2021 | 1,800 | $8.00 | $14,400 |
| 8/10/2021 | 1,801 | $10.00 | $18,010 |
| 9/10/2021 | 1,801 | $9.10 | $16,389.10 |
| | | **Total** | **$443,655.10** |

**Tucker**

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 8/10/2021 | 4,172 | $10.20 | $42,554.40 |
| 8/10/2021 | 5,828 | $10.20 | $59,445.60 |
| | | **Total** | **$102,000** |

**Armistice**

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 4/28/2020 | 1,292,070 | $3.38 | $4,367,196.60 |
| 4/29/2020 | 879,634 | $3.01 | $2629,638.34 |
| 4/30/2020 | 4,434,296 | $2.96 | $13,125,516.16 |
| 5/1/2020 | 1,000,000 | $2.71 | $2,710,000 |
| 5/4/2020 | 957,469 | $2.65 | $2,537,292.85 |
| 5/5/2020 | 692,531 | $2.66 | $1,842,132.46 |
| 5/6/2020 | 50,000 | $2.58 | $129,000 |
| 5/7/2020 | 100,000 | $2.51 | $251,000 |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| | | | |
|---|---|---|---|
| 5/8/2020 | 100,000 | $5.52 | $252,000 |
| 5/11/2020 | 1,300,000 | $2.79 | $3,627,000 |
| 5/12/2020 | 1,581,076 | $3.02 | $4,774,849.52 |
| 5/13/2020 | 525,616 | $2.97 | $1,561,079.52 |
| 5/14/2020 | 834,669 | $3.02 | $2,520,700.38 |
| 5/15/2020 | 458,639 | $2.82 | $1,293,361.98 |
| 5/18/2020 | 650,000 | $2.86 | $1,859,000 |
| 5/20/2020 | 1,150,000 | $3.19 | $3,668,500 |
| 5/21/2020 | 400,000 | $2.97 | $1,188,000 |
| 5/22/2020 | 200,000 | $2.86 | $572,000 |
| 5/27/2020 | 200,000 | $2.61 | $522,000 |
| 6/1/2020 | 200,000 | $2.74 | $548,000 |
| 6/2/2020 | 800,000 | $2.75 | $2,200,000 |
| 6/3/2020 | 400,000 | $2.77 | $1,108,000 |
| 6/26/2020 | 18,226,667 | $10.38 | $189,192,803.46 |
| 6/29/2020 | 9,385,386 | $8.29 | $77,804,849.94 |
| | | **Total** | **$319,283,921** |

95.     Defendants Davis, Yedid, Echerd, Tucker, and Armistice, as well as Boyd and Maher through their positions at Armistice, realized over $300 million in proceeds by means of their insider sales during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements described herein.

## VIII.  DUTIES OF THE INDIVIDUAL DEFENDANTS TO VAXART

### A.     The Individual Defendants' Fiduciary Duties

96.     By reason of their positions as officers, directors and/or fiduciaries of Vaxart, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed and owe, the Company and its shareholders the fiduciary duties of care and loyalty, including the subsidiary duties of good faith, oversight, and disclosure, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.

97.     Each director and officer of the Company owed, and owes, to Vaxart and its shareholders the fiduciary duties of due care, loyalty and good faith in the administration of the affairs of the Company and in the use and preservation of its property and assets.  The duty of care requires informed, deliberative decision-making based on all material information reasonably available.  The duty of loyalty requires acting (including deciding not to act) on a disinterested and independent basis, in good faith, with an honest belief that the action is in the best interests of the Company and its shareholders.

98.     Each director and officer of the Company is required to act in furtherance of the best interests of Vaxart and its shareholders to benefit all of the Company's shareholders equally, and not in furtherance of their personal interest or benefit.

99.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Vaxart, were able to, and did, directly and indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Individual Defendants had knowledge of material, non-public information regarding the Company.  As senior officers and directors of a publicly held company whose stock was registered with the SEC under the Exchange Act and publicly traded, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

100.    At all times relevant hereto, the Individual Defendants were the agents of each other and of the Company and were at all times acting within the course and scope of such agency.  Each of the Individual Defendants' conduct – who were officers and directors of the Company – was ratified by the remaining Individual Defendants who collectively comprised the Company's board of directors at all relevant times herein.

101.    To discharge their fiduciary duties, the officers and directors of Vaxart were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

a.   exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner, so as to make it possible to provide the highest quality performance of their business;

b.   exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner, and in compliance with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

c.   when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence;

d.   remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

e.   establish and maintain systematic and accurate records and reports of the business and internal affairs of the Company and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

f.   exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

g.   refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

h.   examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

### B.   Additional Duties Of The Committee Defendants

102.   In addition to the foregoing duties, the committee members of the Board are tasked with specific duties.   Cherrington, Yedid, and Wilson served on Vaxart's Audit Committee (collectively, the "Audit Committee Defendants").   The Audit Committee's primary functions include, without limitation, assisting the Board in fulfilling its oversight responsibilities relating to the Company's financial accounting, reporting, compliance, and internal controls.   Pursuant to their committee charter (the "Audit Charter"), the Audit Committee Defendants owe and owed specific duties to Vaxart, including, without limitation, to:

> [O]versee the accounting and financial reporting processes of the Company and the audits of the Company's financial statements. Consistent with this purpose, the Committee should encourage continuous improvement of, and should foster adherence to, the Company's policies, procedures and practices at all levels and should provide an open avenue of communication among the independent auditor, financial and executive management team, the Company's internal auditor function, if applicable (the *"internal auditor"*), and the Board.

103.   Additionally, the Audit Charter details the following responsibilities regarding the Company's financial statements and disclosures:

> i.   Meet to review and discuss with management and the independent auditor the annual audited financial statements (including the related notes), the disclosures to be made in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of the Company's Form 10-K, and the form of audit opinion to be issued by the independent auditors on the financial statements, and recommend to the Board the inclusion of the audited financial statements in the Company's Form 10-K and whether the Form 10-K should be filed with the Commission.
>
> ii.   Meet to review and discuss with management and the independent auditor the Company's quarterly financial statements prior to the filing of each Form 10-Q, including the results of the independent auditor's review of the quarterly financial statements and the disclosures to be made in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of the Form 10-Q.
>
> iii.   Review with management and the independent auditor: any major issues regarding accounting principles and financial statement presentation, including any significant change in the Company's selection or application of accounting principles, and any significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements.
>
> iv.   Review and discuss with management (including the internal auditor) and the independent auditor the adequacy and effectiveness of the Company's internal controls and the adequacy of disclosures about changes in internal control over financial reporting. Review and discuss with management the adequacy and effectiveness of the Company's disclosure controls and procedures. Consider

with management, the internal auditor and the independent auditor, as appropriate, whether any changes to the Company's internal controls or disclosure controls and procedures are appropriate in light of their evaluations of the adequacy and effectiveness of such internal controls and such disclosure controls and procedures. Review any remedial measures proposed by management in response to any identified (a) significant deficiencies or material weaknesses in the design or operation of internal controls or material weaknesses therein, (b) fraud, whether or not material, involving management or other employees who have a significant role in the Company's internal controls, or (c) significant deficiency in the adequacy or effectiveness of the Company's disclosure controls and procedures.

v.      Review and discuss with management (including the internal auditor) and the independent auditor management's annual report on internal control over financial reporting and, if so required, the independent auditor's attestation report on the Company's internal control over financial reporting prior to the filing of the Company's Form 10-K.

vi.     Review and discuss with the independent auditor:

A.      all critical accounting policies and practices used by the Company;

B.      all alternative treatments of financial transactions within U.S. generally accepted accounting principles (*"GAAP"*) that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor;

C.      any problems or difficulties encountered in the course of the audit work, including any restrictions on the scope of the independent auditor's activities or on access to requested information, and any significant disagreements with management;

D.      any critical audit matter (*"CAM"*) addressed in the audit of the Company's financial statements and the relevant financial statement accounts and disclosures that relate to each CAM;

E.      any accounting adjustments that were proposed by the independent auditor but were "passed" (as immaterial or otherwise);

F.      any "management" or "internal control" letter or schedule of unadjusted differences issued or proposed to be issued by the independent auditor to the Company; and

G.      other material written communications provided by the independent auditor to the Company's management.

vii.    Discuss with management the Company's quarterly press releases, as well as financial information, earnings guidance and other disclosures, if any, provided to analysts and rating agencies, in each case, prior to their release.

viii.   Discuss with management and the independent auditor the effect of new or revised regulatory and accounting policies or initiatives as well as off-balance sheet structures on the Company's financial statements, if any.

ix.     Discuss with management the Company's major financial, information security (including cybersecurity) and data privacy risk exposures and the steps management has taken to monitor and control such exposures.

x.      Discuss with management the Company's guidelines and policies to govern the process by which risk assessment and management is undertaken and handled.

xi.     Review and discuss with the independent auditor the matters required to be discussed by applicable requirements of the Public Company Accounting Oversight Board (**"PCAOB"**) and the Commission.

xii.    Review disclosures made to the Committee by the Company's principal executive officer and principal financial officer during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud, whether or not material, involving management or other employees who have a significant role in the Company's internal controls.

104.    Upon information and belief, the Company maintained an Audit Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the members of the Audit Committee, as those set forth above.

105.    Cherrington, Finney, and Wheadon serve on Vaxart's Compensation Committee (collectively, the "Compensation Committee Defendants"). The Committee's primary functions include, without limitation, overseeing the Company's policies with respect to the compensation of the Company's board members and officers. Pursuant to their committee charter, the Compensation Committee Defendants, owed and owe specific duties to Vaxart, including, without limitation, to:

a.      review the Company's compensation strategy;

b.      review and approve compensation of officers;

c.      evaluate and recommend the compensation of the CEO; and

d.      review officer stock ownership guidelines.

106.    Davis and Yedid serve on Vaxart's Nominating and Corporate Governance Committee (collectively, the "Nominating and Governance Committee Defendants"). The Nominating and Governance Committee's primary functions include, without limitation, "identify individuals qualified to become Board members (consistent with criteria approved by the Board), recommend director candidates to the Board and its committees, develop and recommend Corporate Governance Principles to the Board, perform a leadership role in shaping the Company's corporate governance policies, and any related matters required by federal securities laws." Pursuant to their committee

29

charter, the Nominating and Governance Committee Defendants, owed and owe specific duties to Vaxart, including, without limitation, to:

     a.    review the adequacy of the Vaxart Code;

     b.    consider the Board's leadership structure;

     c.    consider procedures for stockholder communications; and

     d.    oversee the process for evaluation of the performance of the Board.

### C.    **Duties Pursuant To The Company's Code Of Conduct**

107.    The Individual Defendants, as officers and/or directors of Vaxart, were also bound by the Company's Code of Conduct (the "Code") which sets out basic principles to guide all directors, officers, and employees of the Company, who are required to know and conduct themselves in accordance therewith, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.  The Code provides that:

> Vaxart, Inc. (the ***"Company"***) is committed to being a good corporate citizen and conducting its business affairs in an honest and ethical manner, and therefore requires all of its employees, directors, representatives and agents to follow a code of conduct (the ***"Code"***). In addition, having such a code is a requirement for the Nasdaq Stock Market where the Company's shares are listed. This commitment cannot be achieved unless you, as an employee, director or representative of the Company, individually accept your responsibility to promote and demonstrate integrity and a high level of ethical conduct in all of your activities. Activities that may reasonably be expected to call into question, or negatively impact, the Company's reputation or integrity should be avoided. The Company expects all of its employees, directors, representatives and agents to follow the spirit of this Code, obey applicable laws, exercise good judgment, act ethically, and in general, do the "right" thing.

108.    Specifically, the Code requires:

> Compliance with Laws and Regulations
>
> The Company seeks to comply with both the letter and spirit of the applicable laws and regulations in all cities, states, countries in which it operates.
>
> The Company is committed to complying with the laws and regulations of the countries in which it operates its business. You are expected to comply with all applicable laws, rules and regulations in performing your duties on behalf of the Company. Many national, state and local laws and regulations define and establish obligations with which the Company, its employees, representatives and agents are expected to comply. Under certain circumstances, national, state or local law may establish requirements that differ from this Code. You are expected to comply with all applicable laws in conducting the Company's business. If you violate these laws or regulations in performing your duties on behalf of the Company, you not only risk individual consequences, prosecution, civil actions and penalties, you may also subject the

30

Company to the same or a different set of risks and penalties. If you violate regulations or laws in performing your duties for the Company, you may be subject to immediate disciplinary action, including possible termination of your employment or affiliation with the Company.

Full, Fair, Accurate, Timely and Understandable Disclosure

It is of critical importance to the Company that all disclosure in reports and documents that it files with, or submits to, the U.S. Securities and Exchange Commission (***"SEC"***), and in other public communications made by the Company, is full, fair, accurate, timely and understandable. You are expected to take all steps available to assist the Company in fulfilling these responsibilities consistent with your role within the Company. In particular, you are required to provide prompt and accurate answers to all reasonable inquiries made to you in connection with the Company's preparation of its public reports and disclosure.

The Designated Officers are responsible for designing, establishing, maintaining, reviewing and evaluating the effectiveness of the Company's disclosure controls and procedures on a quarterly basis, (as such term is defined by applicable SEC rules) and for taking all steps necessary or advisable to ensure that all disclosure in reports and documents filed with or submitted to the SEC, and all disclosure in other public communication made by the Company, is full, fair, accurate, timely and understandable. The Designated Officers rely on the Company's Disclosure Committee (which is composed of members of management) (the ***"Disclosure Committee"***) to assist them in discharging these responsibilities.

The Designated Officers are also responsible for establishing and maintaining adequate internal control over financial reporting to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles (***"GAAP"***). The Disclosure Committee also assists them in this regard, and undertakes steps necessary to maintain compliance with established accounting procedures, the Company's system of internal controls, and GAAP. The Disclosure Committee's role is to ensure that the Company makes and keeps books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and disposition of the assets of the Company.

Any involvement or collusion to conceal, misrepresent, or engage in gross negligence or fraud related to the Company's accounting records or financial statements will not be tolerated and will result in disciplinary action, up to and including termination of employment or affiliation with the Company.

Insider Trading

You should never trade securities on the basis of material, non-public confidential information acquired through your employment or fiduciary relationship with the Company.

You are prohibited under both U.S. Federal law and Company policy from purchasing or selling Company stock, directly or indirectly, on the basis of material non-public information concerning the Company. As such, the Company has adopted an Insider Trading Policy, which directors and employees should have received or have had an opportunity to review, a copy of which is available from the Designated Officers. Any person possessing material non-public information about the Company must not engage in transactions involving Company securities until this information has been

sufficiently disseminated to the public. Generally, material information is that which would be expected to affect the investment decision of a reasonable investor or the market price of the Company's stock. You are expected to also refrain from trading in the stock of other publicly-held companies, such as existing or potential customers or suppliers, on the basis of material confidential information about them obtained by you in the course of your employment or service as a director. It is also illegal to recommend a stock (i.e., "tip") to someone else on the basis of material non-public information. If you have a question concerning the appropriateness or legality of a particular securities transaction, please consult with the Designated Officer.

### D.   Duties Pursuant To Corporate Governance Principles

109.   The Individual Defendants, as directors of Vaxart, were also bound by the Company's Corporate Governance Principles (the "Principles"), which state that the Board "has the responsibility to organize its functions and conduct its business in the manner it deems most effective and efficient, consistent with its duties of good faith, due care and loyalty."  The Principles state that the Board's primary functions are to:

a.   Oversee management in the conduct of the Company's businesses;

b.   Oversee management's efforts to establish and maintain the highest standards of legal and ethical conduct in all of the Company's businesses, including conformity with all applicable laws and regulations;

c.   Review, evaluate and, where appropriate, approve, the Company's major strategies and long-term plans and its performance against these objectives;

d.   Select, evaluate and compensate the Company's Chief Executive Officer ("CEO") and other senior officers and review management succession planning;

e.   Oversee management's efforts to protect the Company's assets through the maintenance of appropriate accounting, financial reporting and financial and other controls;

f.   Review the Company's policies and practices with respect to risk assessment and risk management;

g.   Review and approve material transactions and commitments not entered into in the ordinary course of business;

h.   Provide advice and counsel to senior management;

i.   Evaluate the overall effectiveness of the Board and its committees;

j.   Evaluate, select and recommend an appropriate slate of candidates for election as directors; and

k.   Ensure that effective systems are in place for periodic and timely reporting to the Board on important matters concerning the Company, including the following:

i.      Current business and financial performance, the degree of achievement of approved objectives and the need to address forward-planning issues.

ii.     Future business prospects and forecasts, including actions, facilities, personnel and financial resources required to achieve forecasted results.

iii.    Financial statements, with appropriate segment or divisional breakdowns.

iv.     Compliance programs to assure the Company's compliance with law and corporate policies.

v.      Material litigation and governmental and regulatory matters.

vi.     Monitoring and, where appropriate, responding to communications from stockholders.

### E.   Control, Access, and Authority

110.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Vaxart, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Vaxart.

111.    Because of their advisory, executive, managerial, and directorial positions with Vaxart, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Vaxart.

112.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Vaxart and was at all times acting within the course and scope of such agency.

### F.   Reasonable and Prudent Supervision

113.    To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of Vaxart.  By virtue of such duties, the Individual Defendants were required to, among other things:

a.      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

b.      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.      properly and accurately guide investors and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about Vaxart's business and financial prospects and internal controls;

d.      remain informed as to how Vaxart conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, and take steps to correct such conditions or practices, and make such disclosures as necessary to comply with securities laws;

e.      refrain from trading on material, adverse, non-public information; and

f.      ensure that Vaxart was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## IX.    BREACHES OF DUTIES

114.    Each Individual Defendant and Wrongful Refusal Defendant, by virtue of their position as a director and/or officer, owed to Vaxart and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of Vaxart, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants and Wrongful Refusal Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Vaxart, the absence of good faith on their part, and a reckless disregard for their duties to Vaxart and its shareholders that the Individual Defendants and the Wrongful Refusal Defendants were aware, or should have been aware, posed a risk of serious injury to Vaxart.

115.    The Individual Defendants each breached their duty of loyalty, including the subsidiary duties of good faith, oversight, and disclosure, by issuing, or causing the Company to issue,

false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

116.   The Individual Defendants breached their duties of loyalty and good faith by allowing the other Individual Defendants to deceive, or by themselves deceiving, the investing public and artificially inflating and maintaining the market price of the Company's securities by making, or causing to be made, untrue statements and omissions about Vaxart's business, operational, and compliance policies, including falsely claiming that Vaxart was making progress on developing a COVID vaccine and failing to inform the public that Vaxart had not been selected to participate in the federal OWS program.

117.   The Wrongful Refusal Defendants violated their fiduciary duties by failing to act independently, in good faith, and within the realm of sound business judgment in considering and responding to the Demand.

118.   Thus, the Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, directly, and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company, which resulted in substantial harm to the Company.

119.   Specifically, as members of the Audit Committee, the Audit Committee Defendants breached their fiduciary duties of good faith and loyalty by, *inter alia*, failing to implement sufficient internal controls and procedures and/or recklessly and indifferently failing to follow internal controls and procedures to ensure the accuracy of the Company's public statements.  Because of this failure, the Company issued false and misleading statements concerning the Company's business practices, operations, and financial prospects, including falsely claiming that Vaxart was making progress on developing a COVID vaccine and failing to inform the public that Vaxart had not been selected to participate in the federal OWS program.

120.   As a result of this misconduct, Vaxart shareholders initiated a securities fraud class action against the Company, its officers and directors, and Armistice: *In re Vaxart, Inc. Securities Litigation*, Case No. 3:20-cv-05949-VC (N.D. Cal.).  On January 29, 2021, the plaintiffs there filed an amended consolidated complaint ("CAC").  The CAC brings claims for violations of Sections

1  10(b), 20(a), and 20A of the Securities Exchange Act of 1934, alleging, *inter alia*, defendants

2  deceived the investing public by causing them to purchase Vaxart stock at artificially inflated prices,

3  and the officers were then controlling persons of the Company.

4       121.    On March 12, 2021, two groups of defendants filed two motions to dismiss the CAC;

5  the first group consisting of Defendants Davis, Echerd, Finney, Floroiu, Latour, Tucker, Yedid, and

6  Vaxart (the "Vaxart Defendants") and the second group consisting of Defendants Armistice, Boyd,

7  and Maher (the "Armistice Defendants").  Securities Class Action ECF Nos. 99, 101.  However, on

8  December 22, 2021, United States District Court Judge Vince Chhabria denied the motion for all

9  defendants except for Armistice.  The Court determined that the CAC's Section 10(b) and 20(a)

10  claims are actionable against Vaxart and the Individual Defendants, and that the CAC "cogently

11  alleges that Vaxart issued a series of statements with the intent to mislead the investing public into

12  believing that the company was—like Pfizer and Moderna—on the precipice of mass-producing a

13  successful coronavirus vaccine."  Securities Class Action ECF No. 182.

14       122.    In denying in part the motion to dismiss, the Court further found the CAC "adequately

15  alleges that the Vaxart defendants knowingly misled the investing public about the company's

16  progress in developing a vaccine for the coronavirus."  The Court detailed "two statements in

17  particular that plausibly count as material misrepresentations under Rule 10b-5(b): Vaxart's

18  announcement that it had partnered with Attwill, enabling the company to 'manufacture a billion or

19  more doses per year,' and Vaxart's press release the next day announcing that it had been '[s]elected

20  for the U.S. Government's Operation Warp Speed.'"  Securities Class Action ECF No. 182.

21       123.    Regarding scienter, the Court found that the CAC "alleges more than enough to infer

22  intent," as the defendants' were well aware that Attwill was suffering from "deficiencies hampering

23  the company's ability to manufacture even just one vaccine dose."  Additionally, the Court found that

24  the defendants "knew that the company had not been selected to receive federal funding through Warp

25  Speed," and that the CAC "asserts that the defendants knew the company had been selected for the

26  primate study long before the press release, giving them ample time to craft a statement that would

27  mislead the market."  Securities Class Action ECF No. 182.

28       124.    Given the heightened pleading standards applicable to the Securities Class Action,

namely Fed. R. Civ. 9(b) and the Private Securities Litigation Reform Act (15 U.S.C. § 78u-4), and given the Securities Class Action survived, at least in part, defendants' motion to dismiss, there is a high degree of certainty that defendants Boyd, Maher, Finney, Floroiu, Latour, Yedid, Davis, Tucker, and Echerd will face significant liability for their misconduct.   Consequently, Vaxart has expended, and will continue to expend, significant sums of money to rectify the wrongdoing detailed herein.

## X.   CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

125.   In committing the wrongful acts alleged herein, the Individual Defendants and Director Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.   The Individual Defendants and Director Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

126.   During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were.   In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

127.   The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties and unjust enrichment; and (b) disguise and misrepresent the Company's actual business and financial prospects.

128.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.   Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

129.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.   In taking such actions to substantially assist the

1  commissions of the wrongdoing complained of herein, each Individual Defendant acted with

2  knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing,

3  and was aware of his or her overall contribution to and furtherance of the wrongdoing.

4  **XI.    DAMAGES TO VAXART**

5        130.    As a result of the Individual Defendants' wrongful conduct, Vaxart conducted its

6  affairs in evident violation of federal and state laws and regulations.  Moreover, the Company was

7  caused to disseminated false and misleading statements, and omitted material information to make

8  such statements not false and misleading when made.  This misconduct has devastated the Company's

9  credibility.  The Company is the subject of the Securities Class Action, as well as other government

10  investigations.  Vaxart has been, and will continue to be, severely damaged and injured by the

11  Individual Defendants' misconduct.

12        131.    As a direct and proximate result of the Individual Defendants' actions as alleged

13  above, the Company's market capitalization has been substantially damaged as a result of the conduct

14  described herein.

15        132.    Further, as a direct and proximate result of the Defendants' conduct, Vaxart has

16  expended, and will continue to expend, significant sums of money.  Such expenditures include, but

17  are not limited to:

18            a.    costs incurred in connection with being named a defendant in the Securities

19                  Class Action, including the defense and settlement of or judgment in the

20                  litigation, as well as any other related litigation based on the same facts;

21            b.    costs incurred in connection with being investigated by the Office of the U.S.

22                  Attorney for the Eastern District of New York and the Fraud Section of Main

23                  Justice of the Department of Justice, including the defense and settlement of or

24                  judgment in any related civil or criminal proceedings;

25            c.    costs incurred in connection with the lavish and unjustified compensation and

26                  benefits paid to management while they were actively breaching their fiduciary

27                  duties to the Company, including bonuses tied to the Company's attainment of

28

certain objectives, which was based, at least in part, on the Company's artificially-inflated stock price;

d.     costs incurred in connection with the Insider Selling Defendants' misappropriation of Company information in connection with their unlawful insider sales;

e.     costs incurred from the loss of the Company's customers' confidence in Vaxart and its products and services; and

f.     Costs associated with the reputational harm suffered by Vaxart as a result of the misconduct detailed herein, including loss of goodwill, increased borrowing costs, and loss of market capitalization and the resulting impact on the Company's ability to access the capital markets to raise money.

133.   Moreover, these actions have irreparably damaged the Company's corporate image and goodwill.  For at least the foreseeable future, Vaxart will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that the Company's ability to raise equity capital or debt on favorable terms in the future is now impaired.

134.   Finally, the Company has also suffered severe losses in market capitalization as a direct result of the Individual Defendants' wrongdoing alleged herein

## XII.    DERIVATIVE AND DEMAND ALLEGATIONS

135.   Plaintiffs incorporate by reference all prior paragraphs as if fully set forth herein.

136.   Plaintiffs bring this action derivatively, in the right and for the benefit of Vaxart, to redress injuries suffered, and to be suffered, by Vaxart as a direct result of the Individual Defendants' breaches of fiduciary duties and other violations of law.  Vaxart is named as a nominal defendant solely in a derivative capacity.

137.   Plaintiffs will adequately and fairly represent the interests of Vaxart in enforcing and prosecuting its rights.

138.   Plaintiffs are, and have continuously been, shareholders of Vaxart since prior to the start of the Relevant Period, and have been shareholders at all relevant times, including at the time of

1  the Individual Defendants' wrongdoing complained of herein.

2      139.    As detailed below, Plaintiffs' pre-suit Demand has been wrongfully refused by the

3  Board, forcing Plaintiffs to file this shareholder derivative action on behalf of the Company.

4      140.    Given the Board's wrongful, bad-faith, and unreasonable refusal of Plaintiffs' lawful

5  Demand to sufficiently investigate the misconduct, and/or to take sufficient action to remedy the

6  harms caused to the Company, this shareholder derivative action should be permitted to proceed.

7      **A.    Plaintiffs' Demand Allegations**

8      141.    Before filing this derivative action, Plaintiffs first demanded that the board take action

9  and sent a 17-page litigation demand pursuant to Delaware law to the Board on March 5, 2021 (the

10  "Demand").  The Demand demanded that the Board: (i) investigate many of the foregoing facts and

11  claims arising from them, and (ii) if warranted, commence litigation against the Company's directors

12  and officers responsible for damaging Vaxart.  A true and correct copy of the Demand is attached

13  hereto at **Exhibit A.**

14      142.    The Demand described how the Individual Defendants have violated the core fiduciary

15  duty principles described herein during the Relevant Period through their wrongful conduct described

16  above in the Securities Class Action.  To redress these wrongs and prevent such wrongdoing from

17  occurring again in the future, Plaintiffs demanded: (i) the Individual Defendants, and any other

18  persons or entities, account to the Company for all damages sustained, or to be sustained, by the

19  Company by reason of the wrongs and misconduct complained of herein; (ii) no Company funds are

20  used towards any settlement or resolution of the Securities Class Action, among any other related

21  litigation; (iii) the Individual Defendants return to Vaxart all salaries, bonuses, severance, and the

22  value of any other remuneration, of whatever form paid to them by the Company, during the time

23  they were in breach of the fiduciary duties owed to Vaxart; (iv) the disgorgement of all profits realized

24  as a result of the illicit insider sales described herein; (v) terminate, for cause, any Company employee

25  responsible for the wrongdoing alleged herein and, to the extent an officer or director is found to have

26  engaged in wrongdoing, such officer or director of the Company shall immediately be removed from

27  his or her respective position at the Company and/or on the Board for cause; (vi) the Individual

28  Defendants pay interest at the highest rate allowable by law on the amount of damages sustained by

the Company as a result of their culpable conduct; and (vii) adopt corporate governance reforms to ensure that the improper and illegal conduct complained of herein will not occur in the future, including, *inter alia*, reforms to the Company's internal controls and disclosure controls and procedures, conflicts of interest and corporate opportunity policies and procedures, insider selling controls and procedures, and compliance with legal and regulatory requirements.

143.     On March 19, 2021, Plaintiffs' counsel received an email from defendants' counsel informing them that the Board had received the Demand and that the Board would "consider and evaluate the Demand," and "provide [] a further update on this process due course."  A true and correct copy of the Response Letter is attached hereto at **Exhibit B**.

144.     After receiving no further response, Plaintiffs' counsel issued a follow-up letter (the "Follow-Up Letter") to defense counsel on April 19, 2021, requesting information regarding the actions the Board had taken to address Plaintiffs' concerns stated in the Demand.  A true and correct copy of the Follow-Up Letter is attached hereto at **Exhibit C**.

145.     On May 3, 2021, Vaxart's counsel sent an email to Plaintiffs' counsel, which acknowledged receipt of the Follow-Up Letter and stated that Vaxart "anticipates making its quarterly securities filings on May 6, which will include information regarding the Sanetel Stockholder Litigation Demand."  A true and correct copy of this email is attached hereto at **Exhibit D**.

146.     After reviewing the quarterly securities filing, Plaintiffs' counsel responded to Vaxart's counsel with a letter on May 21, 2021, again requesting information regarding its investigation into the conduct alleged in the Demand.  A true and correct copy of this letter is attached hereto as **Exhibit E**.

147.     On April 29, 2022, Plaintiffs' counsel sent defense counsel a letter informing them that Plaintiff Vijayendra Gururaja was joining Plaintiff Kathleen Sanetel's litigation demand.  A true and correct copy of the letter is attached hereto as **Exhibit F**.

     **B.**     **The Board's Investigation Was Unreasonable Under Delaware Law And Its Refusal Of The Demand Was Not A Valid Exercise Of Business Judgment**

148.     As of the date of filing this complaint, Plaintiffs' counsel has not received a response addressing the concerns detailed in the Demand and in the subsequent letters.  The Board failed to act

1  independently, in good faith, and within the realm of sound business judgment when it failed to

2  respond to the Demand, thereby effectively refusing it.

3      149.    The harms complained of in the Demand are actively ongoing and remain unremedied

4  by the Board, causing further damage to the Company with each passing day.  In addition, while the

5  Board is refusing to consider the allegations in the Demand, it is also actively forcing the Company

6  to expend vast sums of money in defense of the very wrongdoers responsible for causing harm to the

7  Company in the Securities Class Action, thereby further damaging the Company.

8      150.    Moreover, the Board's deferral will subject the Company's claims to the applicable

9  statute of limitations period.  These actions by the Board cannot be reasonably interpreted to be in the

10  best interests of the Company or in good faith.

11      151.    Thus, the Board's unwarranted and egregious deferral of its consideration of the

12  Demand will unduly prejudice Plaintiffs and the Company and is therefore a violation of Delaware

13  law.  The Board's actions thus constitute a wrongful refusal of the Demand.  Accordingly, Plaintiffs

14  have satisfied any demand requirement and may pursue this action on behalf of the Company.

15      152.    Making matters worse, a Consolidated Amended Class Action Complaint for

16  Violations of the Federal Securities Laws was filed in the Securities Class Action that brought forth

17  allegations from numerous confidential witnesses formerly employed by the Company and its

18  partners.  *See* Securities Class Action, ECF No. 84 ("CAC").  For example, the CAC includes

19  numerous witness statements regarding Defendant Attwill's inability to produce a COVID vaccine

20  and Vaxart secretly shuttering its norovirus program.  These statements should have been at least

21  investigated by the Board.

22      153.    The Board's unwarranted and egregious deferral of its consideration of the Demand

23  will unduly prejudice Plaintiffs and the Company and is therefore a violation of Delaware law.  The

24  Board's actions thus constitute a wrongful refusal of the Demand.  Accordingly, Plaintiffs have

25  satisfied any demand requirement and may pursue this action on behalf of the Company.

26      154.    Vaxart has been and will continue to be exposed to significant losses due to the

27  Individual Defendants' wrongdoing.  Yet, the Wrongful Refusal Defendants have not filed any

28  lawsuits against any persons who were responsible for the wrongful conduct.  Thus, the Wrongful

Refusal Defendants continue to breach their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches.

155. If Vaxart's current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this complaint by Directors & Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the shareholders. However, Plaintiffs are informed and believe that the D&O Insurance policies covering the Individual Defendants in this case may contain provisions that eliminate coverage for any action brought directly by Vaxart against the Individual Defendants, known as the "insured versus insured exclusion."

156. As a result, if the Wrongful Refusal Defendants were to sue any of themselves or certain of the officers of Vaxart, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. Therefore, the Wrongful Refusal Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

157. Plaintiffs have not made any demand on shareholders of Vaxart to institute this action since such demand would be a futile and useless act for the following reasons:

        a.    Vaxart is a publicly traded company with thousands of shareholders of record and at least hundreds of thousands of beneficial owners;

        b.    Making demand on such a number of shareholders would be impossible for Plaintiffs, who have no means of collecting the names, addresses, or phone numbers of Vaxart's shareholders; and

        c.    Making demand on all shareholders would force Plaintiffs to incur excessive expenses and obstacles, assuming all shareholders could even be individually identified with any degree of certainty.

XIII.   <u>CLAIMS FOR RELIEF</u>

**COUNT I**

**Breach of Fiduciary Duty**
**(Against Individual Defendants)**

158.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

159.   The Individual Defendants owed and continue to owe Vaxart fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Vaxart the highest obligation of good faith, fair dealing, loyalty, and due care in the administration of the affairs of the Company, including, without limitation, the oversight of the Company's compliance with state and federal securities laws, rules, and regulations, as well as the duty of candor and truthful disclosure with respect to their public statements.

160.   The Individual Defendants also owed and owe Vaxart fiduciary duties imposed and defined by the federal securities laws, rules, regulations, and federal substantive corporate law, which impose broad obligations on the Individual Defendants vis-a-vis the corporation and its individual shareholders.   The Individual Defendants violated these fiduciary duties by issuing, causing to be issued, or otherwise allowing the material omissions and misrepresentations described herein.

161.   In addition, the Individual Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including its Code of Ethics and the charters of various Board committees, and principles that, had they been discharged in accordance with the Individual Defendants' obligations, would have prevented the misconduct and the consequent harm to the Company.

162.   Each Individual Defendant violated his or her fiduciary duties by consciously causing, or consciously failing to prevent the Company from engaging in, the improper acts complained of herein.

163.   The Individual Defendants consciously breached their fiduciary duties and violated their corporate responsibilities in at least the following ways:

- Failing to maintain an adequate system of oversight, accounting controls and procedures, disclosure controls, and other internal controls, which were necessary to prevent or promptly correct the improper statements made on the Company's behalf;

- Affirmatively and repeatedly making or allowing to be made, and/or failing to correct, improper statements in Company press releases, SEC filings, and other public statements relating to, among other things, Vaxart's business, operations, and prospects;

- Failing to ensure the Company's compliance with relevant legal and regulatory requirements, including but not limited to requirements imposed under state and federal securities laws;

- Awarding Vaxart's senior executives lavish compensation packages despite their responsibility for the Company's willful misconduct; and

- Reappointing certain directors who had failed in their duties to the Audit Committee.

164.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Vaxart has sustained significant damages.   Accordingly, the Individual Defendants are liable to the Company.

165.   Plaintiffs, on behalf of Vaxart, have no adequate remedy at law.

**COUNT II**

**Breach of Fiduciary Duty**
**(Against the Wrongful Refusal Defendants)**

166.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

167.   The Wrongful Refusal Defendants owed and owe Vaxart fiduciary obligations.   By reason of their fiduciary relationships, the Wrongful Refusal Defendants specifically owed and owe Vaxart the highest obligation of good faith, fair dealing, loyalty, and due care in the administration of the affairs of the Company.

168.   The Wrongful Refusal Defendants violated these fiduciary duties by failing to act independently, in good faith, and within the realm of sound business judgment in considering and

responding to the Demand.

169.    As a direct and proximate result of the Wrongful Refusal Defendants' breaches of their fiduciary obligations, Vaxart has sustained significant damages.  Accordingly, the Wrongful Refusal Defendants are liable to the Company.

170.    Plaintiffs, on behalf of Vaxart, have no adequate remedy at law.

**COUNT III**

**Waste of Corporate Assets**
**(Against All Defendants)**

171.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

172.    As a result of Defendants' misstatements and failure to implement adequate internal controls to ensure that the Company's SEC filings and other public statements were not misleading, Vaxart was subject to the Securities Class Action.  Defendants have caused Vaxart to waste its corporate assets by forcing the Company to expend valuable resources in defending itself in the ongoing litigation, in addition to any ensuing costs from a potential settlement or adverse judgment.

173.    As a result of their waste of corporate assets, Defendants are liable to the Company.

174.    Plaintiffs, on behalf of Vaxart, have no adequate remedy at law.

**COUNT IV**

**Unjust Enrichment**
**(Against All Defendants)**

175.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

176.    By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Vaxart.  Defendants were unjustly enriched as a result of the compensation and remuneration they received while breaching fiduciary duties owed to the Company. Armistice induced the Director Defendants to approve the warrant amendment agreements and provided no consideration to the Company in exchange and therefore, was unjustly enriched as a result.

177.   Plaintiffs, as shareholders and representatives of Vaxart, seek restitution from Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

178.   Plaintiffs, on behalf of Vaxart, have no adequate remedy at law.

**COUNT V**

**Breach of Fiduciary Duty Through the
Misappropriation of Material, Non-Public Information
(Against the Insider Selling Defendants)**

179.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

180.   At the time the Insider Selling Defendants sold their Vaxart stock, they knew the information described above and sold Vaxart stock on the basis of such information.

181.   The information described above was proprietary, non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants misappropriated to their own benefit when they sold Vaxart stock.

182.   The Insider Selling Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

183.   Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

184.   Plaintiffs, on behalf of Vaxart, have no adequate remedy at law.

**COUNT VI**

**Aiding and Abetting Insider Trading
(Against Armistice)**

185.   Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

47

186.    Defendants Boyd and Maher each had a fiduciary relationship with Vaxart and owed Vaxart a fiduciary duty of loyalty.

187.    Boyd and Maher breached their fiduciary duties of loyalty to Vaxart by providing Armistice with material undisclosed adverse information and engaging in unlawful insider trading.

188.    Armistice knowingly participated in Boyd and Maher's breach of fiduciary duty by selling shares motivated in whole or in part by material adverse inside information Boyd and Maher shared with it.

189.    In selling their Vaxart stock, as set forth above, these defendants used Vaxart's non-public information for private gain.

190.    These defendants profited through aiding and abetting breaches of fiduciary duty.

191.    Plaintiffs, on behalf of Vaxart, have no adequate remedy at law.

**COUNT VII**

**Aiding and Abetting Breach of Fiduciary Duties**
**(Against Armistice)**

192.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

193.    Each member of the Director Defendants had a fiduciary relationship with Vaxart and owed Vaxart fiduciary duties.

194.    The Director Defendants breached their fiduciary duties to Vaxart has described herein.

195.    Armistice knowingly participated in the Director Defendants' breach of fiduciary duty by aiding and abetting the approval of the unfair warrant amendment agreement and issuance of materially false and misleading statements as set forth above.

196.    Armistice profited through aiding and abetting those breaches of fiduciary duty and Vaxart was damaged.

197.    Plaintiffs, on behalf of Vaxart, have no adequate remedy at law.

1

**COUNT VIII**

2

**Derivatively for Contribution Under Sections 10(B) and 21D of the Exchange Act**
**(Against the Individual Defendants)**

3

4          198.    Plaintiffs incorporate by reference and reallege each and every allegation contained

5     above, as though fully set forth herein.

6          199.    During the Relevant Period, Vaxart and the Individual Defendants carried out a plan,

7     scheme, and course of conduct which was intended to and, throughout the Relevant Period, did: (i)

8     deceive the investing public, including Plaintiffs and other shareholders, as alleged herein; and (ii)

9     caused Plaintiffs and other shareholders to purchase Vaxart common stock at artificially inflated

10    prices.

11         200.    The Individual Defendants: (i) employed devices, schemes, and artifices to defraud;

12    (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make

13    the statements not misleading; and (iii) engaged in acts, practices, and a course of business which

14    operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to

15    maintain artificially high market prices for Vaxart's common stock in violation of Section 10(b) of

16    the Exchange Act and Rule 10b-5, promulgated thereunder.

17         201.    Vaxart and the Individual Defendants, individually and in concert, directly and

18    indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged

19    and participated in a continuous course of conduct to conceal adverse material information about the

20    Company's financial well-being, operations, and prospects.

21         202.    During the Relevant Period, the Individual Defendants made the false statements

22    specified above, which they knew or recklessly disregarded to be false and misleading in that they

23    contained misrepresentations and failed to disclose material facts necessary in order to make the

24    statements made, in light of the circumstances under which they were made, not misleading.

25         203.    Vaxart and the Individual Defendants had actual knowledge of the misrepresentations

26    and omissions of material fact set forth herein, or recklessly disregarded the true facts that were

27    available to them.  Vaxart and the Individual Defendants engaged in this misconduct to conceal

28    Vaxart's true condition from the investing public and to support the artificially inflated prices of the

49

1    Company's common stock.

2        204.   Plaintiffs and the shareholders have suffered damages in that, in reliance on the

3    integrity of the market, they paid artificially inflated prices for Vaxart's common stock.  Plaintiffs

4    and other shareholders would not have purchased the Company's common stock at the prices they

5    paid, or at all, had they been aware that the market prices for Vaxart's common stock had been

6    artificially inflated by Defendants' fraudulent course of conduct.

7        205.   As a direct and proximate result of Vaxart's and the Individual Action Defendants'

8    wrongful conduct, Plaintiffs and the other shareholders suffered damages in connection with their

9    respective purchases of the Company's common stock during the Relevant Period.

10       206.   By virtue of the foregoing, Vaxart and the Individual Defendants violated Section

11   10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

12   **XIV.  PRAYER FOR RELIEF**

13       WHEREFORE, Plaintiffs demand judgment as follows:

14   A.    Finding that Defendants have breached their fiduciary duties to the Company, wasted

15         corporate assets, were unjustly enriched, and violated the federal securities laws;

16   B.    Directing Vaxart to take all necessary actions to reform and improve its corporate

17         governance and internal procedures to comply with applicable laws and to protect the

18         Company and its shareholders from a repeat of the damaging events described herein,

19         including, but not limited to, putting forward for shareholder vote resolutions for

20         amendments to the Company's Bylaws or Articles of Incorporation, and taking such

21         other action as may be necessary to place before shareholders for a vote on the

22         following corporate governance proposals, actions, or policies:

23       (i)    a proposal to strengthen the Company's accounting and disclosure controls to

24             ensure that all material information is adequately and timely disclosed to the

25             SEC and the public;

26       (ii)   a proposal to develop and implement procedures for greater shareholder input

27             into the policies and guidelines of the Board;

28       (iii)  a provision to permit the shareholders of Vaxart to nominate three candidates

for election to the Board;

    (iv)   an accounting by the Vaxart officers to the Company for all damages sustained, or to be sustained, by the Company by reason of the wrongs and misconduct complained of herein, and should make certain that no Company funds are used towards any settlement or resolution of the Securities Class Action, U.S. Department of Justice investigation, or any related or similar litigation;

    (v)   the termination, for cause, any Company employee responsible for the wrongdoing alleged herein, including its current CEO, Floroiu;

    (vi)   the return to the Company all salaries, bonuses, and the value of other remuneration of whatever kind paid to them during the time they were in breach of their fiduciary duties; and

    (vii)   the payment of interest by Vaxart officers, at the highest rate allowable by law, on the amount of damages sustained by the Company as a result of their culpable conduct.

C.    Against each Defendant in favor of Vaxart for the amount of damages sustained by Vaxart, jointly and severally, in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum legal rate allowable by law;

D.    Requiring Defendants to return to Vaxart all compensation and remuneration of whatever kind paid to them by the Company during the time that they were in breach of their fiduciary duties;

E.    Directing Defendants to establish, maintain, and fully fund effective corporate governance and compliance programs to ensure that Vaxart's directors, officers, and employees do not engage in wrongful or illegal practices;

F.    Granting additional appropriate equitable and/or injunctive relief to remedy Defendants' misconduct, as permitted by law;

G.    Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

H.    Granting such other and further relief as this Court deems just and equitable.

XV.   <u>**DEMAND FOR JURY TRIAL**</u>

Plaintiffs demand a trial by jury as to issues so triable.

Dated:  May 13, 2022                                      **JOHNSON FISTEL, LLP**

                                                 By:   */s/ Brett M. Middleton*
                                                       BRETT M. MIDDLETON

                                                       FRANK J. JOHNSON
                                                       JONATHAN M. SCOTT
                                                       501 West Broadway, Suite 800
                                                       San Diego, CA 92101
                                                       Telephone: (619) 230-0063
                                                       Facsimile: (619) 255-1856
                                                       BrettM@johnsonfistel.com
                                                       FrankJ@johnsonfistel.com
                                                       JonathanS@johnsonfistel.com

                                                       *Attorneys for Plaintiffs Kathleen Sanetel*
                                                       *and Vijavendra Gururaja*

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## **VERIFICATION**

I, Kathleen Sanetel, am a plaintiff in this derivative action. I have reviewed the allegations made in the foregoing verified shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 5/10/2022

_____

KATHLEEN SANETEL

DocuSign Envelope ID: 7F7A0EC3-F564-4276-99E5-9A35907354D2

## VERIFICATION

I, Vijayendra Gururaja, am a plaintiff in this derivative action.  I have reviewed the allegations made in the foregoing verified shareholder derivative complaint, know the contents thereof, and authorize its filing.  To those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 5/9/2022

DocuSigned by:

*Vijayendra Gururaja*

D0293605C7FC456...

VIJAYENDRA GURURAJA